## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        **Plaintiff,**

v.

**JAMAL SHAREEF WILLIAMS (01),**
**ZEBEDEE KALEIF WILLIAMS (02), and**
**ANTHONY DAVON WILLIAMS (03),**

        **Defendants.**

Case No. 14-cr-40094-DDC

## MEMORANDUM AND ORDER

The three defendants in this case have filed motions asking the Court to suppress evidence—six kilograms of a cocaine mixture—that police recovered after an officer stopped and searched a vehicle occupied by defendants.  Defendants assert that the traffic stop and vehicle search violated their rights under the Fourth Amendment to the Constitution, and, as a result, the Court must suppress the cocaine discovered during the vehicle search.  Defendant Jamal Williams filed the principal Motion to Suppress Evidence (Doc. 28, *amended by* Doc. 31). Defendants Anthony Williams and Zebedee Williams filed Motions to Join Jamal Williams' motion (Docs. 27, 29), which also assert additional arguments in support of suppressing the evidence.  The government filed a response brief (Doc. 34), and Zebedee and Jamal Williams each filed a reply (Docs. 37, 38).  The Court conducted a hearing on defendants' motions on January 12 and January 15, 2015.  After carefully considering the arguments and evidence the parties have presented, the Court denies defendants' motions for the reasons set forth below.

## I.     Background

Defendants' motions arise from facts that occurred during an approximately 45-minute period following a traffic stop conducted by Trooper David Stahl of the Kansas Highway Patrol on an I-70 exit ramp in Wabaunsee County, Kansas.  A dashboard camera ("dashcam") mounted in Trooper Stahl's patrol car captured most of the relevant events.  The dashcam also has an audio recording component, which was attached to Trooper Stahl's belt.[1]  The dashcam recording establishes most of the facts described below, but where the video is unclear or incomplete, the Court has supplemented the facts with testimony Trooper Stahl, Zebedee Williams, and Anthony Williams provided at the suppression hearing.  The Court has also relied on some of the information contained in Trooper Stahl's police report.

At around 10:43 p.m. on July 23, 2014, Trooper Stahl had positioned himself facing northbound on Tallgrass Road, just off I-70 exit 322 (the "Tallgrass Exit").  From his position, Trooper Stahl could view eastbound I-70 traffic exiting onto Tallgrass Road.  Earlier that day, Trooper Stahl had placed two "ruse" drug checkpoint signs, which were visible to vehicles just before they reached the Tallgrass Exit as they traveled eastbound on I-70.  The first sign read "Drug Checkpoint Ahead."  The second sign warned travelers, "Drug Canine in Use" at the checkpoint.  In reality, there was no drug checkpoint.  The ruse checkpoint signs are a tactic used by Kansas Highway Patrol troopers to identify suspicious drivers.  Troopers position themselves near the next exit ramp and watch for suspicious vehicles attempting to evade the pretend checkpoint.  *See United States v. Neff*, 681 F.3d 1134, 1135, 1138-41 (10th Cir. 2012) (explaining police tactic of using "ruse" checkpoint signs and holding that a driver's exit from the interstate after seeing ruse check point signs is, by itself, insufficient justification for a

---

[1] The audio recording stopped as Trooper Stahl was conducting his search of the vehicle, approximately 26 minutes into the dashcam recording.  Fortunately, the audio component captured most of the dialogue relevant to the legality of this search.

vehicle stop).  Trooper Stahl had positioned himself on Tallgrass Road so that he could observe drivers exiting the interstate after seeing the ruse checkpoint signs.

From his position facing northbound on Tallgrass Road, Trooper Stahl observed a white Chevrolet Silverado pickup truck exit the interstate and turn left (north) onto Tallgrass Road. The truck failed to complete a stop at the stop sign located at the intersection of the exit ramp and Tallgrass Road.  Suspecting a traffic violation, Trooper Stahl began following the truck. After the truck turned left again, this time onto the I-70 west ramp heading in the opposite direction the truck traveled before it encountered the ruse checkpoint signs.  Trooper Stahl activated his emergency lights, causing the truck to pull over to the side of the road.

Trooper Stahl then exited his patrol car, approached the passenger side of the vehicle, and advised the driver that he had stopped him because he failed to complete a stop at the stop sign. Trooper Stahl testified that, approaching the vehicle for the first time, he noticed the back-rear tire was a different size and style than the other three tires on the vehicle.

The occupants of the vehicle were the three defendants in this case.  Jamal was the driver, Zebedee was sitting in the passenger's seat, and Anthony was sitting in the back seat of the truck's extended cab.  Trooper Stahl requested licenses and the vehicle registration.  In his police report and in his oral commentary captured by the dashcam, Trooper Stahl noted that, at this point, Jamal and Zebedee appeared to be extremely nervous.  According to Trooper Stahl's report, Jamaal's hands shook, his body trembled, and he avoided eye contact with Trooper Stahl. [2]  He observed similar nervous behavior from Zebedee, noting that Zebedee's hands and body were trembling, he was sweating profusely, and his carotid artery was "visibly pulsing" in his

---

[2] It is not the custom of this Court to refer to parties by their first names.  It does so in this Order for clarity, as defendants share the same last name.  The Court intends no disrespect to defendants by using their first names.

neck.  After some confusion, Zebedee and Jamal handed Trooper Stahl their driver's licenses and a copy of a rental agreement with Hertz Rent-a-Car ("Hertz").

During this initial conversation, Trooper Stahl also asked defendants about their travel plans, and they stated they were on their way to Pittsburgh, Pennsylvania.  Trooper Stahl then asked where defendants were coming from.  They did not appear to answer immediately.  Trooper Stahl testified that when he repeated the question, defendants looked at each other hesitantly until Jamal replied they were coming from western Kansas, though none of the defendants seemed to know which town.  Trooper Stahl then took the rental agreement and Jamal's driver's license back to his car.

Back in his patrol car, Trooper Stahl radioed his location, the vehicle registration information, and Jamal and Zebedee's driver's license information to the police dispatcher.  The dispatcher advised that she could not identify a valid registration for the vehicle.  While he waited for the dispatcher to process the remaining information, Trooper Stahl narrated some of his mental impressions about the situation into his audio recorder.  He stated three times that defendants seemed very nervous.  He mentioned that Jamal tried to hand him a Firestone service center receipt instead of the vehicle information, but mentioned that fact as evidence of Jamal's nervousness only.  He did not mention anything about the Firestone receipt coming from a service center in Phoenix, Arizona just two days earlier.  He also did not comment at this time about the irregularly sized wheel or the extra spare tire.  Trooper Stahl did note, however, that the rental agreement showed an expiration date of July 20, 2014—three days earlier—but acknowledged that he "[did not] know if they got an extension or not."  Trooper Stahl observed that the rental agreement identified "Dawn Mackey" as the individual who had rented the truck,

contrary to Jamal's claim that he had rented it.  Trooper Stahl also noted that he saw a bag in the bed of the truck.

Trooper Stahl proceeded to radio the dispatcher and ask if she could locate a nearby Wabaunsee County officer to come assist him.  Trooper Stahl then began to comment about his impression of defendants' explanation for turning around at the Tallgrass Exit, but the dispatcher interrupted him.  The dispatcher communicated that Zebedee's driver's license was valid, but that Jamal's licenses had expired.  The dispatcher also informed Trooper Stahl that Jamal had a criminal history.  She did so by listing a series of codes, and Trooper Stahl testified he understood them to mean that Jamal had a parole violation and a felony drug offense on his record.  The dispatcher could not identify the specific drug violation, only that it was a violation of the "Cosmetic Act."  The dispatcher did, however, identify Jamal as a "Signal One" which, Trooper Stahl testified, was a code signal for "armed and dangerous."

After receiving the information from the dispatcher, Trooper Stahl stated, "Ok, here goes nothing."  He proceeded to describe his skepticism toward defendants' explanation for why they turned around.  As told by Trooper Stahl, their explanation claimed they intended to switch drivers at a truck stop because Jamal was tired.  But they had missed the exit for the truck stop, and, realizing this, they were turning around to drive back to it.  Trooper Stahl stated that defendants' explanation did not "make any sense whatsoever" because they simply could have traded drivers at the exit without backtracking to the truck stop.  Suspicious of defendants, Trooper Stahl stated he intended to reapproach the vehicle, terminate the traffic stop, but attempt to extend the stop by initiating a "consensual encounter."

Trooper Stahl again approached the vehicle and returned defendants' rental agreement and driver's licenses.  He informed them he was just going to issue Jamal a warning and asked

him to make sure he "gets stopped" next time.  Defendants thanked him.  Without stepping away

from the truck or otherwise breaking engagement with defendants, Trooper Stahl asked another

question:  "Your rental agreement showed [the truck] due back on [July] 20th, you called and got

it extended?"  Defendants responded that they had, in fact, called Hertz and extended the rental

agreement.  Zebedee then asked Trooper Stahl if they could switch drivers before they got back

on the road.  Trooper Stahl responded that it would be acceptable, even advisable, to switch

drivers now because Jamal did not have a valid driver's license.  Again, without breaking contact

with the truck, Trooper Stahl initiated a new line of questioning:

> Trooper Stahl:  But let me explain something to you, ok?  You guys saw the [drug
> checkpoint] signs back there when you came through?  [To Anthony] Sir, do you
> mind just keeping your hands where I can see them?  I don't know you guys . . .
>
> Anthony:  Ok, [inaudible] … I'm sorry.
>
> Trooper Stahl:  It's no problem, I just don't know you, ok.  You saw the signs
> when you came through, right?
>
> Jamal:  Absolutely [inaudible] . . .
>
> Trooper Stahl:  That's what I do, I deal with large amounts of illegal narcotics,
> weapons, [inaudible], terroristic stuff, things like that.  You guys don't have
> anything like that in your vehicle?
>
> Jamal or Zebedee:  No, sir.
>
> Trooper Stahl:  Do you have a problem if a take a quick look in the back of the
> vehicle?
>
> Jamal or Zebedee:  [inaudible]
>
> Trooper Stahl:  Is that alright?
>
> Jamal or Zebedee:  [inaudible]

The audio from Trooper Stahl's recording device does not reveal clearly whether

defendants consented to Trooper Stahl's request to search the truck, and Anthony also testified

6

that he did not definitely hear Jamaal or Zebedee consent to the search.  Nevertheless, the Court credits Trooper Stahl's testimony that defendants consented to the search because it is consistent with other video and audio evidence.  The audible part of the conversation proceeds as if defendants answered "yes" to Trooper Stahl's request, and the video shows defendants exiting the vehicle promptly and cooperating with Trooper Stahl in a manner consistent with an affirmative answer to his request for consent.

Trooper Stahl then asked defendants to exit the truck, patted them down for weapons, and asked them to stand at a spot located about 15 feet to the front-right of the truck.  At this point, a Wabaunsee County officer had arrived on the scene and stood with defendants as Trooper Stahl began to search the vehicle.

Trooper Stahl began his search by looking in the bed of the truck.  There he noticed a spare tire resting in the bed of the truck.  After rummaging around the truck bed for about five seconds, he walked to the back of the truck.  He crouched down so he could look up at the undercarriage of the truck, and exclaimed "ah-ha!" excitedly, realizing that the rental vehicle was carrying an extra spare tire.  Trooper Stahl thought this was suspicious because he knew that rental vehicles were not normally equipped with extra spare tires.  He also noticed fingerprints and tool marks around the rim of the spare, suggesting that someone had recently removed the tire from its rim.

Trooper Stahl immediately returned to the bed of the truck to investigate further the tire that was there.  In the video, it appears that he lifted the tire and moved it slightly.  At the hearing, Trooper Stahl testified that when he lifted the tire, it felt heavier than it should, and when he moved the tire, he could hear a metal "clanking" sound.  Thereafter, the audio recorded him muttering to himself, "There's something in this tire."

Suspecting that something was concealed in the tire, Trooper Stahl walked back to his car and retrieved a density meter.[3]  He applied the density meter first to the spare underneath the truck and then to the spare in the bed of the truck.  The density meter showed readings ranging from 45 to 69, which Trooper Stahl testified he understood to be higher than normal readings for a tire filled with pressurized air only.

At this point, Trooper Stahl believed the circumstances established probable cause that defendants had concealed illegal contraband inside the tires.  He placed all three defendants in handcuffs and instructed them to sit on the bed of the truck.  Trooper Stahl asked the defendants if he could take the tires to an automobile service shop nearby so that he could disassemble and look inside them.  The defendants agreed, although Trooper Stahl acknowledged that he did not need their permission at this point.  Wabaunsee County officers then transported the tires to Blue Stem Auto Shop in Alma, Kansas.  Workers at the shop removed the tires from the rims.  Inside each tire, officers found a metal box bolted together around the rims.  One box contained nine small plastic-wrapped packages containing a cocaine mixture; the other contained eight.  In total, the two spare tires contained approximately six kilograms of cocaine mixture.  The officers transported defendants to the Wabaunsee County Jail.  The government now has indicted defendants for possessing cocaine with intent to distribute and conspiring to possess cocaine with intent to distribute.

## II.    Analysis

### A.    Law Governing Search and Seizure

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches

---

[3] Trooper Stahl explained that a density meter is a device an officer can apply to the surface of an object to measure the density of that object.  He testified that the KHP equips some, but not all, officers with this device.

and seizures." U.S. Const. amend. IV.  The "exclusionary rule," which the Supreme Court formulated to remedy Fourth Amendment violations, prohibits the government from admitting in a criminal prosecution evidence obtained as a direct or indirect result of an unconstitutional search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)

A vehicle stop and the accompanying detention of its occupants "constitute a 'seizure' within the meaning of the Fourth Amendment." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991).  But a vehicle stop is a limited seizure and is "more like an investigative detention than a custodial arrest." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Courts, therefore, "analyze the stop and detention of a vehicle under the principles of *Terry v. Ohio*, 392 U.S. 1 [] (1968)." *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1503 (10th Cir. 1996).  Under *Terry*, an investigatory detention is reasonable and, hence, constitutional if it is: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstance which justified the interference in the first place." 392 U.S. at 20.

A detention is justified at its inception if it is supported by reasonable suspicion.  This standard requires that "the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion that a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (citing *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990)).  The level of "suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence" or the level of suspicion required to support probable cause.  *Id.* at 1255-56 (internal quotation marks and citations omitted).  When the Court determines whether reasonable suspicion exists, it looks "to the 'totality of the circumstances,' rather than assessing each factor or piece of evidence in isolation." *Id.* at 1256 (quoting *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010)).

Moreover, reasonable suspicion may exist "even if it is more likely than not that the individual is not involved in any illegality." *United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009). Nevertheless, "an inchoate and unparticularized suspicion or hunch" is insufficient to establish reasonable suspicion. *Id.* at 1255 (internal quotation marks and citations omitted).

The scope of an investigative detention is reasonable if it is "'carefully tailored to its underlying justification.'" *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). In the context of a routine traffic stop, the permissible scope allows an officer to "request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* at 1349 (citation omitted). The investigative detention usually must "'last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Royer*, 460 U.S. at 500). Two exceptions to this rule permit an officer to extend the length of an investigative stop beyond the scope dictated by its original purpose. "First, [an] officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *Id.* (citing *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993)). "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Id.* (citing *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)).

Defendants' motions raise a number of issues affecting the constitutionality of the challenged search and seizure of their vehicle. Those issues include: (1) whether each defendant has standing to assert a Fourth Amendment violation; (2) whether reasonable suspicion supported the initial stop of the vehicle; (3) whether Trooper Stahl extended the traffic stop beyond its permissible scope without reasonable suspicion or consent to do so; (4) whether defendants voluntarily consented to Trooper Stahl's search of the vehicle; (5) whether Trooper

Stahl's search of the vehicle exceeded the scope of defendants' consent; and (6) whether the Fourth Amendment violations, if any occurred, warrant suppression of the cocaine mixture found in defendants' vehicle.  The Court addresses each issue, in turn, below.

### B.      Standing to Assert a Fourth Amendment Violation

To determine whether an individual has standing to assert a Fourth Amendment violation, the Court asks two familiar questions:  "(1) whether the defendant has manifested a subjective expectation of privacy in the object of the challenged search, and (2) whether that expectation of privacy was objectively reasonable."  *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (further citations omitted)).  In the case of vehicle occupants, a passenger normally does not have a legitimate expectation of privacy in a vehicle to which he claims neither a possessory nor a property interest.  *See Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978).  Nevertheless, "a defendant may establish a reasonable expectation of privacy by presenting evidence of some lawful control or possession of the vehicle."  *Gama-Bastidas*, 142 F.3d at 1239 (citing *United States v. Eylicio-Montoya*, 18 F.3d 845, 851 (10th Cir. 1994)).

The government first asserts that each defendant lacks standing to challenge the search because none of their names appeared on the rental agreement.  As support, the government cites the Tenth Circuit's decision in *Gama-Bastidas*, where the Circuit held that a defendant lacked standing to challenge a vehicle search when the rental car agreement did not name him as a renter or an authorized driver.  142 F.3d at 1239; *see also United States v. Obregon*, 748 F.2d 1371, 1375-76 (10th Cir. 1984).  Although the Court rejects the government's contention that *Gama-Bastidas* establishes a "bright-line" rule, the Court agrees that a rental agreement's failure to authorize an individual to drive the vehicle expressly is highly probative of whether a

possessory or property interest—and, therefore, an expectation of privacy—existed in the rental vehicle. *See id.* (holding that defendant lacked standing because his name did not appear on the rental agreement and he did not otherwise assert a sufficient privacy interest in the vehicle).

The government's argument fails as a factual matter, at least as it applies to Zebedee. Zebedee has submitted documents from Hertz, which reflect that on July 13, 2014—the same day Dawn Mackey rented the truck—Zebedee was added as an authorized driver. *See* Docs. 39-1, 39-2. Trooper Stahl testified that he was unaware Hertz had added Zebedee as an authorized driver. But his ignorance of this fact is not relevant here. The Court's analysis of standing—as opposed to analysis of an officer's reasonable suspicion or probable cause—is not limited to facts known to an officer at the time of the search. *United States v. Grandberry*, 730 F.3d 968, 976 n.6 (9th Cir. 2013) (citing Wayne R. LaFave, *6 Search & Seizure* § 11.3 at 162 (5th ed. 2012)). In light of this fact, the Court concludes that Zebedee had a sufficient possessory interest in the vehicle to establish a legitimate expectation of privacy in the truck and its contents. He therefore has standing to assert a Fourth Amendment violation and seek suppression of evidence discovered during the search of the truck.

The standing analysis for Jamal and Anthony differs because they neither rented the vehicle nor received authority to drive under the rental agreement. Recognizing this fact, defendants seek to establish standing on a different theory. They claim that, although they cannot assert a legitimate privacy expectation in the vehicle, they can assert that an officer detained their persons unlawfully. [4]   Indeed, the Tenth Circuit "'has repeatedly recognized that

---

[4] In his Reply (Doc. 38), Jamal does not concede fully that he lacks a legitimate expectation of privacy in the vehicle even though the rental agreement did not authorize him to drive the vehicle. He recognizes that Tenth Circuit precedent virtually forecloses this Court from finding that a driver not authorized by a rental agreement can nonetheless assert a legitimate privacy expectation in a rental car. *See United States v. Worthon*, 520 F.3d 1173, 1183 (10th Cir. 2008). But he urges that the Circuit should adopt the law of the Sixth, Eighth, and Ninth Circuits. Those circuits permit a non-authorized driver to

although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention.'" *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000)).  To suppress evidence as the fruit of an unlawful detention, a defendant must make two showings:  (1) "'that the detention did violate his Fourth Amendment rights'"; and (2) "that there is 'a factual nexus between the illegality and the challenged evidence.'"  *Id.* (quoting *Nava-Ramirez*, 210 F.3d at 1131).

Here, defendants allege that Trooper Stahl detained them beyond the constitutionally permissible duration of a traffic stop.  In other words, defendants claim that Trooper Stahl coercively restrained their own freedom to leave and discovered evidence as the result of that detention.  If their allegations are true, defendants properly have asserted a Fourth Amendment violation under an "unlawful detention" theory.  Tenth Circuit law permits Jamal and Anthony to assert this type of suppression theory.  The Court concludes, therefore, that Jamal and Anthony have standing to assert their suppression motion on this basis.  But the Court will reach the merits of their motions under the unlawful detention theory only because they lack standing to challenge the search more directly.

---

challenge the search of a rental vehicle if the driver has the affirmative consent of an authorized driver. *See United States v. Smith*, 263 F.3d 571 (6th Cir. 2001); *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998); *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006).  Helpfully, Jamal notes that he raised this argument primarily to preserve it on appeal, recognizing that this Court is bound to apply the Tenth Circuit's law.  Thus, the Court notes Jamal's argument but for obvious reasons follows Tenth Circuit precedent.  *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir.1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits.").

### C.      Justification for Traffic Stop at its Inception

In his suppression motion, Jamal argues that Trooper Stahl did not have sufficient reasonable suspicion of criminal activity to justify the initial traffic stop.  He reserved the opportunity to present arguments in support of this assertion until after hearing Trooper Stahl's testimony at the suppression hearing.  At the hearing, defendants never contested, but refused to concede, that the traffic stop was supported by reasonable suspicion.  The Court has reviewed the video captured by Trooper Stahl's dashcam and finds that the traffic stop was justified at its inception.

The video clearly shows that defendants turned north onto Tallgrass Road without completing a stop at the stop sign.  This violated K.S.A. § 8-1528(b) (requiring that drivers come to a stop at stop signs).  Having witnessed a traffic violation, Trooper Stahl was justified in stopping defendants' vehicle.  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation").

### D.      Extension of the Traffic Stop

Because reasonable suspicion of a traffic violation justified Trooper Stahl's initial stop of defendants' vehicle, he was not permitted, at least initially, to detain defendants any longer than necessary to investigate the traffic violation.  *Soto*, 988 F.2d at 1554.  During a routine traffic stop, "the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation."  *Id.* (citation omitted).  "The detaining officer may also question the vehicle's occupants [about] their identities, travel plans, and ownership of the vehicle."  *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003) (citation omitted).  But once the driver has produced a valid license and proof of his right to

14

operate the vehicle, and the officer has returned the driver's license and registration, "the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009) (citation omitted); *see also Soto*, 988 F.2d at 1554.

In this case, Trooper Stahl continued to engage defendants after he returned their licensed and registration papers.  Approximately 90 seconds had elapsed between the time Trooper Stahl returned defendants' licenses and registration papers and the time defendants consented to his request to search the vehicle.  "The Supreme Court has also made clear, however, that an individual 'may not be detained *even momentarily* without reasonable, objective grounds for doing so.'"  *United States v. Lopez*, 443 F.3d 1280, 1285 (10th Cir. 2006) (citing *Royer*, 460 U.S. at 498) (emphasis in *Lopez*).  Accordingly, the government must justify the extension of the encounter by establishing either:  (1) that the stop become a "consensual encounter"; or (2) that Trooper Stahl developed reasonable suspicion that defendants were engaged in criminal activity. *See Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003).  The government relies on both theories, claiming that both consent and reasonable suspicion either one sufficed to permit Trooper Stahl to continue to detain and question defendants after he returned their licenses and registration papers.

### 1.    Question to Clarify Rental Agreement was Permissible

After returning defendants' licenses and registration papers, advising them he would be letting them off with a warning, and cautioning defendants to make sure to come to a complete stop next time, Trooper Stahl asked defendants another question:   "I was going to ask—your rental agreement showed [the truck] due back on the 20th, did you realize that?"  One of the defendants replied that they had called Hertz and extended the agreement.  While defendants

15

correctly assert that a traffic stop "*generally* ends when the officer returns the driver's license, registration, and insurance information," *see United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003) (emphasis added), this rule is subject to important exceptions.  Significantly, the officer may ask questions unrelated to the original purpose of the traffic stop if there exists an "objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *Hunnicutt*, 135 F.3d at 1349.

Here, Trooper Stahl reviewed the rental agreement while he was in his patrol car and noticed that the agreement, by its terms, had expired three days earlier.  Defendants urge the Court to follow *United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005), where the Tenth Circuit held that a recently expired rental agreement is insufficient to support reasonable suspicion of drug possession.  But reasonable suspicion of drug possession is not necessary to justify this particular question.  Trooper Stahl's question was tailored narrowly to confirm whether defendants were still authorized to drive the vehicle.  The Court concludes he was permitted to ask it.  *See United States v. Prado*, No. 2:11-CR-892, 2012 WL 3756925, at *5 (D. Utah Aug. 28, 2012) (notwithstanding the Tenth Circuit's holding in *Santos*, after the driver presented an expired rental agreement, the officer "could have pursued his investigation of the discrepancy by asking [defendant] for additional information about the rental"); *see also Villa*, 589 F.3d at 1339 (verifying a driver's right to possess a vehicle is within the permissible lawful scope of a routine traffic stop).  Thus, reasonable suspicion permitted Trooper Stahl to extend the stop briefly and confirm that defendants, in fact, had extended the rental agreement.

Immediately after defendants explained that they had extended the rental agreement, Zebedee initiated the following exchange:

Zebedee:  Can I ask you something, officer?

Trooper Stahl:  Yes sir?

Zebedee:  Do you mind if we switch [drivers here?]

Trooper Stahl explained that defendants were not only free to switch drivers where they had stopped, but that it would make more sense than backtracking several miles to the rest stop.  At this point, it was Zebedee, not Trooper Stahl, who prolonged the encounter.  Thus, the Court must determine whether, under the totality of the circumstances, he did so voluntarily.

### 2.      Defendants Extended the Traffic Stop Voluntarily

"A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."  *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996) (citing *Werking*, 915 F.2d at 1408-09).  A "consensual encounter" occurs when a private citizen cooperates voluntarily with an officer's non-coercive questioning.  *Id.*  The critical factor bearing on whether a police encounter is a consensual one is "whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter."  *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v. Little*, 60 F.3d 708, 711 (10th Cir. 1995)).  If an individual feels free to leave during the encounter, the individual has not been "seized" within the meaning of the Fourth Amendment.  *Id.*

In traffic stop cases, the Tenth Circuit has identified a number of additional factors bearing on whether an encounter was consensual, including:  (1) "the threatening presence of several officers"; (2) "the use of aggressive language or tone of voice indicating that compliance with the officer's request is compulsory"; (3) "the prolonged retention of a person's personal effects such as identification"; (4) "the absence of other members of the public"; and (5) "the

officer's failure to advise the defendant[s] that [they] are free to leave." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (internal quotation marks and citations omitted).

The Court has considered these factors and concludes that defendants consented to an extension of the encounter with Trooper Stahl voluntarily. Trooper Stahl was the only officer on the scene for most of the encounter. The dashcam video shows the Wabaunsee County officer walking toward the rear of the vehicle during the exchange, but it is unclear whether any defendant even noticed his presence. In any event, the Court cannot characterize the second officer's presence as a "threatening" show of police force such that it rendered the encounter coercive.

Trooper Stahl also spoke in a calm and polite tone throughout the encounter. Defendants dispute this characterization, pointing out that Trooper Stahl asked Anthony to "keep [his] hands where [he] can see them" just before he questioned them about the ruse checkpoint signs. But the audio record of the encounter dispels defendants' characterization. It reflects an even-tempered exchange and immediately after Trooper Stahl asked Anthony to keep his hands in view, he explained the safety concerns that prompted his request. An officer is entitled to take reasonable safety precautions, even during a consensual encounter. *United States v. House*, 463 F. App'x 783, 791 (10th Cir. 2012) (noting that an officer's need to protect himself "applies equally to investigative detentions and consensual encounters."). Here, Trooper Stahl's command was minimally coercive. He apologized for asserting the request so quickly and explained that it was merely a safety precaution. The Court does not find that this slight, safety-oriented show of authority undermined the otherwise consensual nature of the encounter.

The next two factors—whether the officer prolonged retention of defendants' personal effects and whether the encounter took place in public view—also favor a finding that the

encounter was a voluntary one.  Trooper Stahl returned defendants' licenses and registration papers promptly and before he asked any questions unrelated to the traffic stop.  And the stop took place on the side of a public road, in view of the highway traffic.  *Soto*, 988 F.2d at 1558.

Finally, the Court notes that Trooper Stahl failed to advise defendants they were free to leave.  Although an officer's failure to advise a person explicitly that he is free to leave is a factor the Court should consider, it is not dispositive.  *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999).  In this case, Trooper Stahl returned defendants' papers, advised them he would just issue them a warning, and cautioned them to "make sure you get stopped next time."  The Tenth Circuit has held that similar phrases convey to reasonable people that the police encounter has ended and they are free to leave.  *See Ledesma*, 447 F.3d at 1315 (a reasonable person understands "[p]hrases like 'thank you' and 'have a safe one'" to mean that he or she is free to terminate the police encounter).  Moreover, after Trooper Stahl returned the defendants' papers, Zebedee asked him whether they could switch drivers.  Zebedee's question contemplated that defendants would soon resume their trip and, thus, signaled a belief that they were, in fact, free to leave.  Although Trooper Stahl never said the magic words explicitly, the Court finds this omission insignificant because defendants otherwise understood they were free to leave.  As a result, the Court concludes that the balance of the factors require it to find that defendants extended the traffic stop voluntarily.

### E.     Defendants' Consent to the Vehicle Search was Voluntarily

After answering Zebedee's question about switching drivers, Trooper Stahl proceeded to seek defendants' consent to search the vehicle.  The audio recording does not reveal defendants' response to the request clearly, and Anthony disputes that any defendant actually consented to the search.  But as the Court has explained, the totality of the circumstances resolves this fact in

the government's favor.  The video evidence is consistent with Trooper Stahl's testimony that defendants verbally consented to the search.  Having determined that defendants voluntarily extended their encounter with Trooper Stahl and agreed to the search, the Court must next determine whether their consent to a search of their vehicle was given voluntarily.

The factors bearing on whether defendants' consent to a search was voluntary are the same as those bearing on whether defendants' consent to extend a traffic stop was voluntary. *Compare United States v. Vasquez*, No. 12-20066-20-KHV, 2013 WL 3895283, at *4 (D. Kan. July 29, 2013) (listing factors bearing on whether consent to vehicle search was voluntary), *with Ledesma*, 447 F.3d at 1314 (listing factors bearing on whether police encounter was consensual). Here, Trooper Stahl asked for permission to search defendants' vehicle immediately after defendants voluntarily extended the traffic stop.  The surrounding circumstances were the same. As a result, the same analysis that led the Court to conclude defendants extended the traffic stop leads it to conclude that defendants also consented to the search voluntarily.  Again, there was no overbearing show of police authority, Trooper Stahl had returned defendants' papers, he maintained the same polite and nonthreatening tone, and the exchange occurred in the same visible and public place.  Thus, based on the totality of the circumstances, the Court concludes defendants consented to the vehicle search freely and without coercion.

But defendants persist.  Relying on *United States v. Gastellum*, defendants argue that their consent was not voluntary because Trooper Stahl "conditioned" their right to leave on allowing him to search their vehicle.  927 F. Supp. 1386, 1389 (D. Colo. 1996).  In *Gastellum*, the court held an officer had conditioned the defendant's right to drive away on the defendant agreeing to a vehicle search when the officer prefaced his request for consent with the phrase, "Before you go . . ."  The court found that this language rendered the officer's request coercive

and, thus, the defendant's consent involuntary.  According to defendants, Trooper Stahl likewise conditioned their right to leave when he prefaced his request to search their vehicle with the phrase, "But let me explain something, okay?"

The facts in *Gastellum* are distinguishable from the facts here.  First, in *Gastellum*, the court concluded that the initial vehicle stop was illegal because no traffic violation occurred.  *Id.* at 1393.  Second, the officer's words—"*Before you go*"—by their definitions, restricted the defendant's freedom to terminate the encounter unless he complied with the officer's requests. *Id.* at 1389.  In contrast, here, Trooper Stahl's words—"*But let me explain something*"— imposed no condition on defendants' right to terminate the encounter or otherwise decline Trooper Stahl's request to search the vehicle.  Rather, it is introductory language leading to the Trooper's request for consent.  Taking Trooper Stahl's words as a whole, as the *Gastellum* court did, the Court finds that the phrase "*let me* explain something" merely requests defendants' permission to continue the dialogue.  The Court recognizes that defendants may have interpreted these words, spoken by a law enforcement officer, to mandate compliance.  Nevertheless, the test of whether a police encounter is coercive is an objective one, *see United States v. Rogers*, 391 F.3d 1165, 1171 (10th Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 323 (1994)), and thus the Court must interpret the meaning of Trooper Stahl's request objectively and from the totality of the circumstances.  In doing so, the Court concludes that he did not condition defendants' right to terminate the encounter on their consent to a vehicle search in a way that rendered his request coercive.

### F.     Whether the Search Exceeded the Scope of Defendants' Consent

Defendants next contend that, even if they gave Trooper Stahl permission to look in the back of the vehicle, his search exceeded its authorized scope because:  (1) Trooper Stahl

conducted a thorough search of the vehicle rather than a "look in the back"; and (2) defendants' consent did not authorize Trooper Stahl to use a density meter to examine the inside of the tires.

"Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances." *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). "The test for measuring the scope of consent is one of objective reasonableness: '[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *United States v. Wald*, 216 F.3d 1222, 1228 (10th Cir. 2000) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). When applying this test, courts generally do "not attach an unduly restrictive meaning to the officer's request to 'look' inside [a] vehicle." *See United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990). Moreover, "where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle." *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995).

### 1.    Initial Search did not Exceed Authorized Scope

Here, Trooper Stahl prefaced his request to search by explaining that it was his job to enforce narcotics and gun laws and by asking defendants if they "had anything like that" in their vehicle. Based on this exchange, defendants should have understood that Trooper Stahl intended to conduct a sufficiently comprehensive search to discover hidden guns and weapons. *United States v. Ramstad*, 308 F.3d 1139, 1146-47 (10th Cir. 2002) (where the expressed purpose of a search is to look for drugs or contraband, consent "implies that the officer [can] look wherever drugs might be hidden" (citation omitted)). This scope included, at a minimum, the bed of the truck and the contents of the items in it. It also included Trooper Stahl's visual inspection of the spare tire underneath the truck. *But see United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th

Cir. 1993) (undercarriage of a vehicle is part of its exterior and not afforded a reasonable expectation of privacy, and, thus, an officer's brief visual examination of it is not a search under the Fourth Amendment).  As a result, the Court concludes that defendants' consent authorized Trooper Stahl to search the bed of the truck, including the extra tire in the truck bed, and to inspect visually the spare tire attached to the truck's undercarriage.

After briefly inspecting the tire in the bed of the truck, Trooper Stahl crawled under the truck to inspect the undercarriage.  He exclaimed "ah-ha!" when he realized another spare was attached to the truck's undercarriage.  He then returned to the truck bed and remarked, "I bet there's something in this tire."  The Court concludes, at that moment, Trooper Stahl had developed probable cause to believe there was contraband hidden in the spare tires, based on the following factors:  (1) defendants' vehicle carried an extra spare tire, which rental vehicles normally do not carry; (2) markings on the spare tire attached to the truck's undercarriage indicated it had been handled and possibly modified recently; (3) the spare tire in the truck's bed felt heavier than a tire normally would, and when moved, it produced sounds suggesting there was a metal object inside of it; and (4) Trooper Stahl knew that drug traffickers frequently concealed contraband in spare tires.

### 2.    Use of Density Meter was Lawful Regardless of Consent

Defendants' next argument contends that Trooper Stahl exceeded the scope of their consent when he applied a density meter to three of the vehicle's tires.  Defendants assert that no "reasonable person" would understand permission to "look" in a vehicle also to authorize the use of sensory enhancing technology to measure the interior density of the tires.  Our Court has recently found a defendant's consent to "take a look" in a vehicle permits an officer to apply a density meter to the vehicle's tires.  *United States v. Long Tien Dang*, No. 05-40073-01-RDR,

2012 WL 1416680, at *8 (D. Kan. Apr. 24, 2012) (officer's use of density meter did not exceed defendant's consent to officer taking "a quick look in the car." ).  Nevertheless, the Court does not need to decide whether Trooper Stahl's use of the density meter exceeded the scope of defendants' consent here.  Even if the Court found that the use of the density meter exceeded the scope of defendants' consent, suppression would not be appropriate for two reasons.

First, before Trooper Stahl used the density meter, probable cause existed that contraband was concealed in the tires.  Even though defendants' initial grant of consent might not have justified Trooper Stahl's use of the density meter, the probable cause that arose in the meantime did.  *See United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000) (probable cause to search a vehicle can arise during the course of the stop) (citation omitted).

Second, Trooper Stahl testified that when he lifted the tire in the truck bed, he noticed that it felt heavier than usual.  He testified further that when he moved the tire, he could hear a metal "clanking" sound.  The sound indicated that there was an object in the tire, which, based on the surrounding circumstances, he suspected was contraband.  Even without the aid of the density meter, Trooper Stahl had reason to suspect that contraband was concealed in one of the tires.  Although the density meter bolstered his suspicions, the evidence establishes that Trooper Stahl would have discovered the contraband in the tires even if he had relied on his normal sensory perception only.  Thus, even if the use of the density meter was unlawful, suppression is not the correct outcome because Trooper Stahl still had other, lawfully procured grounds to suspect contraband in the tires.  *See United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) (under the inevitable discovery doctrine, courts should not suppress unlawfully seized evidence if the police otherwise would have discovered the evidence lawfully).

### III.     Conclusion

Defendants have failed to establish a Fourth Amendment violation.[5]  Defendants extended the traffic stop voluntarily and consented to Trooper Stahl's request to search the vehicle.  Trooper Stahl's observation during the course of the consensual search gave rise to probable cause that defendants possessed contraband, thereby permitting him to detain them until he was able to disassemble the tires and discover the cocaine concealed within them.  Having concluded that no Fourth Amendment violation occurred, the Court denies defendants' motions to suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Jamal Williams' Motion to Suppress Evidence (Doc. 28 *amended by* Doc. 31), as joined by Anthony Williams (Doc. 27) and Zebedee Williams (Doc. 29), is denied.

**IT IS SO ORDERED.**

**Dated this 10th day of February, 2015, at Topeka, Kansas**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[5] The government advanced alternative theories supporting the legality of the stop and search: consent and reasonable suspicion.  The parties devoted significant portions of their briefs and their arguments at the suppression hearing to whether reasonable suspicion existed for Trooper Stahl to conduct an investigatory detention and search of the vehicle.  The Court acknowledges that this question is a close one.  However, because the Court concludes separate rationales justified each of the next phases of the encounter, it does not need to resolve whether reasonable suspicion of drug possession, by itself, supported an extended investigatory detention.  The narrower justifications discussed in this Order are sufficient to support the legality of the stop and search.